UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

Calvary Chapel of Ukiah, a California
Non-Profit Corporation; Calvary Chapel of
Fort Bragg, a California Non-Profit
Corporation; and River of Life Church, a
California Non-Profit Corporation,

        Plaintiffs,

    v.

Gavin Newsom, in his official capacity as
Governor of California; Sonia Angell,
M.D., in her official capacity as California
Public Health Officer; Noemi Doohan,
M.D., in her official capacity as Public
Health Officer, Mendocino County; and
Ngoc-Phuong Luu, M.D., in her official
capacity as Butte County Public Health
Officer, M.D., in her official capacity as
Butte County Public Health Officer ,

        Defendants.

No.  2:20-cv-01431-KJM-DMC

ORDER

Plaintiffs Calvary Chapel of Ukiah, Calvary Chapel Fort Bragg and River of Life Church

move for a preliminary injunction.  Mot., ECF No. 19.  Plaintiffs request the court enjoin

California from enforcing a restriction on indoor singing within places of worship, alleging the

restriction unconstitutionally discriminates against plaintiffs' religious activities in violation of

1

their First and Fourteenth Amendment rights. *Id.* at 2, 8.[1]  Defendants California Governor Gavin Newsom, California Public Health Officer Sandra Shewry, Mendocino County Public Health Officer Noemi Doohan and Butte County Public Health Officer Ngoc-Phuong all are sued in their official capacities; they all oppose the motion.  State Defendants' Opp'n (State Opp'n), ECF No. 33; Mendocino Defendants' Opp'n (Mendocino Opp'n), ECF No. 31.  Butte County joins the State's opposition in its entirety.  Butte County Joinder, ECF No. 32.  Defendants argue the State's restriction on indoor singing and chanting during worship services, which is essentially coextensive with the defendant counties' restrictions, constitutes a permissible non-discriminatory exercise of the State's power, justified by public health data and the need to combat the spread of COVID-19.  State Opp'n at 25-26; Mendocino Opp'n at 2-3.  Plaintiffs' reply challenges the manner in which the State relies on the public health science in determining indoor singing is dangerous and argues the ban on indoor singing is not evenly applied across comparable activities.  Reply, ECF No. 45.

The court held a videoconference hearing on November 6, 2020, with counsel Erik Zimmerman appearing for plaintiffs; counsel Todd Grabarsky appearing for defendants Gavin Newsom, Sonia Angell and Ngoc-Phuong-Luu; and counsel Christian Curtis appearing for defendant Noemi Doohan.  At hearing, plaintiffs' counsel confirmed that plaintiffs' motion narrowly challenges the State's restrictions on indoor singing in worship services, and not other worship restrictions.  Following the hearing, plaintiffs filed a surreply as authorized by the court, responding to defendants' citation of supplemental authority shortly before the hearing. ECF Nos. 54, 56.

Since the hearing, both parties have filed several notices of supplemental authority, including very recently.  *See* ECF Nos. 60, 61, 62, 64, 65, 66, 70, 71, 73, 74.  At the court's direction in January 2021, the parties provided supplemental briefing to address the evolving legal landscape at that time.  *See* Order (Jan. 11, 2021), ECF No. 68; Pls.' Suppl. Brief (Jan. 15, 2021), ECF No. 69; State Suppl. Brief (Jan. 22, 2021), ECF No. 70.  After the court ordered that

---

[1] To avoid confusion, this order cites to the page numbers applied by the court's CM/ECF system to the top right of each page.

2

1    briefing, the Ninth Circuit decided two cases addressing some of the issues raised in this case.

2    *See S. Bay United Pentecostal Church v. Newsom,* 985 F.3d 1128 (9th Cir. 2021); *Harvest Rock*

3    *Church, Inc. v. Newsom,* 985 F.3d 771 (9th Cir. 2021). The Supreme Court granted in part an

4    application for injunctive relief in the first of these two cases, *South Bay United Pentecostal*

5    *Church v. Newsom*, 592 U.S. ___, 141 S. Ct. 716, No. 20-746, 2021 WL 406258 (U.S. Feb. 5,

6    2021).

7        The court has reviewed the parties' supplemental filings and the most recent controlling

8    decisions carefully, takes notice of any changes to the State's guidance documents as relevant,

9    and has considered the entirety of the record on the pending motion. As explained below, in light

10    of the current controlling precedent and regulatory framework, given the nature of the relief

11    requested here, the court **denies** the motion for a preliminary injunction.

12    **I.**      **BACKGROUND**

13        **A. Parties' Claims and Arguments**

14        Plaintiffs do not dispute that COVID-19 represents a profound public health crisis for

15    California and this country, nor do they disagree with the State's data on infections and deaths.

16    *See* State Opp'n at 2 (when motion filed, 7.9 million Americans infected, 217,000 had died

17    including 16,800 Californians); *see also* CDC, Covid Data Tracker[2] (28.9 million infections,

18    524,695 deaths); Tracking COVID-19 in CA[3] (54,395 deaths in California). Plaintiffs also do not

19    seriously dispute the State's argument that until comprehensive vaccine programs roll out and

20    herd immunity is achieved, the State has a single mechanism to fight the disease: slowing its

21    spread. *See* State Opp'n at 2-3; Mot. at 17. Plaintiffs do dispute what methods are required to

22    slow the spread. They contend the State's restriction on singing, in effect in some form since July

23    2020, is not properly supported by public health expertise and in any event overreaches in a way

24    that interferes with their constitutionally protected rights to practice their religion, especially

25    through singing during worship services.

26

27    [2] https://covid.cdc.gov/covid-data-tracker/#datatracker-home.

28    [3] https://covid19.ca.gov/.

1    Plaintiff River of Life Church is located in Butte County; plaintiffs Calvary Chapel of

2    Ukiah and Calvary Chapel Fort Bragg are in Mendocino County.  First Am. Compl. (FAC) at 2–

3    3, ECF No. 15.  Plaintiffs hold weekly worship services that include prayer, song and sermons by

4    a pastor; they believe singing aloud and singing with one another is integral to their faith.  Mot. at

5    13.  They claim the State's prohibition on congregational singing "essentially prohibit[s]

6    corporate worship . . . ."  *Id.* at 13.  Each pastor has verified the complaint, FAC at 20–22, and

7    also has submitted a declaration explaining the religious value of congregational worship to

8    himself and his congregants.  *See* Thompson Decl., ECF No. 48; *see also* Green Decl.,

9    ECF No. 49; Les Boek Decl., ECF No. 50.

10    As noted, plaintiffs' counsel made clear at hearing: the present challenge attacks only the

11    State's restriction on congregations' singing indoors.  Specifically, plaintiffs assert the restrictions

12    on indoor singing in places of worship violate their (1) free exercise rights, (2) freedom of speech,

13    (3) equal protection rights and (4) rights under the Establishment Clause.  Mot. at 14–23.

14    Plaintiffs argue the restriction on indoor singing and chanting is not generally applicable, as it is

15    not applied in "schools, camps, day care centers," "television and film production," or other

16    "secular locations" where singing is a regular occurrence.  *Id.* at 16, 17.  Plaintiffs also point to a

17    six-day lag early on in the pandemic in applying indoor chanting restrictions to protest activities,

18    as well as to statements by the Governor supporting political protests as evidence of

19    discriminatory animus against religious organizations.  *Id.* at 16–19.

20    The State contests all of plaintiff's assertions.  The State argues indoor worship services

21    with singing and chanting pose a unique danger to the public due to the manner in which COVID-

22    19 spreads.  State Opp'n at 7.  The State argues the prohibition on indoor singing is necessary to

23    reduce the spread of infected respiratory droplets, which transmit the virus readily in large

24    quantities when singing takes place indoors.  *Id.*  The State also points to its bans on singing and

25    chanting "indoors at protests, schools, and other secular activities," which, it argues, demonstrates

26    religious and secular activities receive the same treatment.  *Id.* at 8.

27    /////

28    /////

4

1    The court reviews the relevant regulatory history below, beginning with a general

2    overview and then summarizing specific regulations governing singing and chanting, including

3    during worship services.

4         **B. Overview of California COVID Regulations**

5         Since first declaring a State of Emergency on March 4, 2020, California's Governor and

6    public health authorities have enacted a series of generally applicable orders designed to manage

7    and limit the spread of COVID-19.  These general orders do not contain restrictions on singing

8    and chanting; those restrictions appear in separate guidance documents discussed below.

9    Depending on the public health landscape at a given time, the general orders have tightened or

10   loosened restrictions based on public health professionals' advice.  *See, e.g.*, Exec. Order N-33-

11   20,[4] Ex. B, ECF No.15-2 (March 19, 2020 order requiring "all individuals living in the State of

12   California to stay home or at their place of residence except as needed to maintain continuity of

13   operations of the federal critical infrastructure sectors," resulting in closure of in-person

14   gatherings in many establishments and businesses, including places of worship); State Opp'n at

15   10 & Watt Decl. ¶¶ 67–68, 71–72, ECF No. 39 (in May 2020, loosening restrictions to permit

16   some in-person religious services and other gatherings such as protests, both indoors and

17   outdoors); Watt Decl. ¶ 72 (in June 2020, attendance caps on outdoor religious services removed

18   based on scientific data suggesting transmission mitigated substantially outdoors).

19        Along the way, the State also has adopted certain overarching frameworks to guide its

20   management of restrictions and in one instance late last year imposed a temporary, blanket stay-

21   at-home order.  In April 2020, the State adopted a "Resilience Roadmap" to chart reopening of

22   certain enumerated sectors of the economy based on the risks associated with workplace

23   environments; the Roadmap imposed disinfection and physical distancing guidelines applicable to

24   all sectors.  *See* Office of Gavin Newsom, April 2020 Resilience Roadmap (April 28, 2020).[5]  In

---

25   [4] State of California, *Executive Order N-33-20* (Mar. 19, 2020) https://www.gov.ca.gov/wp-
26   content/uploads/2020/03/3.19.20-attested-EO-N-33-20-COVID-19-HEALTH-ORDER.pdf.

27   [5] https://www.gov.ca.gov/2020/04/28/governor-newsom-provides-update-on-californias-
     pandemic-resilience-roadmap/.  The court takes judicial notice of the April 2020 Resilience
28   roadmap.  The court may take judicial notice of state regulations and guidelines to the extent they

1   August 2020, the State replaced the Roadmap with a "Blueprint for a Safer Economy," which

2   places counties into tiers depending on the severity of COVID-19 prevalence within their borders

3   and then, depending on the tier, places restrictions on certain activities.  *See* Watt Decl. ¶ 91; Stay

4   Home Q&A at 55, Ex. 28, ECF No. 39-2.  Initially, under the Blueprint, all indoor worship was

5   banned within Tier 1, *see* Blueprint Sector Restrictions at 82, Ex. 30, ECF No. 39-2 (adopted

6   August 28, 2020) (disallowing all indoor worship at Tier 1), but later, the ban was modified to

7   allow indoor worship with some restrictions.  For example, places of worship in counties in

8   "Widespread" Tier 1, which includes Sacramento, Mendocino and Butte counties, can now host

9   indoor gatherings with a maximum 25 percent capacity.  Places of Worship Industry Guidance

10  (Feb. 22, 2021) (Feb. 22, 2021 Guidance).[6]  Since the Ninth Circuit's January 2021 remand in

11  *South Bay*, *supra,* the State has removed the numerical attendance caps applicable in Tier 2 and

12  Tier 3 of the Blueprint, but retained the percentage limits.  *Id.*  At this writing, the Blueprint

13  continues to serve as a comprehensive, overarching document setting forth the parameters of the

14  State's COVID-19 requirements.  Cal. Dep't of Pub. Health, *Blueprint for a Safer Economy*

15  (updated March 5, 2021).[7]  The Blueprint does not contain detailed provisions applicable to

16  singing and chanting, including indoor singing; as noted above, those provisions are contained in

17  separate Guidance documents.  The Blueprint and the Guidance documents all have the force of

18  law.  *See, e.g.*, Exec. Order N-33-20, Ex. B, ECF No.15-2.

19  /////

20  /////

21  /////

22  ──────────────

23  are publicly available on a government website.  *See Kater v. Church Downs Inc.,* 886 F.3d 784, 788 n.3 (9th Cir. 2018) (taking judicial notice of government documents on government website).

24  [6] https://covid19.ca.gov/industry-guidance/ (Places of worship and cultural ceremonies – updated
25  February 22, 2021" dropdown). The court takes judicial notice of the February 22 updates to the
    July 26 places of worship guidelines. Some of the updates are also memorialized in the most
26  recent State notice of supplemental authority, ECF No. 74.

27  [7] The court takes judicial notice of this government website *available at*
    https://covid19.ca.gov/safer-economy/.
28

6

1    Although the State enacted a December 2020 Regional Stay Home Order, which further

2    limited all activity across the State, that order was temporary and in effect only until January 25,

3    2021.  Cal. Dep't of Pub. Health, *About Covid-19 Restrictions* (updated March 9, 2021).[8]

4         **C.  Regulation of Singing and Chanting**

5              **1.   Churches**

6    In July 2020, the State issued its first restrictions on group singing in places of worship.

7    On July 1, 2020, the California Department of Public Health (CDPH) issued a guidance document

8    requiring churches generally to "discontinue singing and chanting activities."  July 1 Places of

9    Worship Industry Guidance at 4, Ex. A, ECF No. 15-1 (July 1, 2020 Guidance).  While plaintiffs

10   suggest the July 1 restrictions applied strictly to churches and were expanded only later to cover

11   schools and indoor political protests, Mot. at 9, the State appears to dispute the characterization

12   that the initial ban on indoor singing was exclusive to places of worship, Watt Decl. ¶¶ 82, 83

13   (averring that by July 1, 2020, California banned indoor singing and chanting at places of

14   worship, protests, and schools).

15   By July 6, 2020, CDPH updated the July 1 Guidance for churches, clarifying the

16   restriction called for them to "discontinue indoor singing."  *See* July 6 Worship Guidance, Ex. C,

17   ECF No. 15-3 (July 6, 2020 Guidance).  Since July 6, 2020, CDPH has issued two additional

18   updates to the Guidance for churches, one on July 29, 2020, and then again most recently on

19   February 22, 2021, following the Supreme Court's decision in *South Bay, supra*.  July 29

20   Worship Guidance, Ex. G, ECF No. 15-7 (July 29, 2020 Guidance); Feb. 22, 2021 Guidance.

21   Prior to February 22, 2021, across every update since July 6, 2020, the State required that

22   "[p]laces of worship must [ ] discontinue indoor singing and chanting activities," July 6, 2020

23   Guidance at 4; July 29, 2020 Guidance at 4, providing specifically that places of worship should

24              discontinue singing (in rehearsals, services, etc.), chanting, and other
              practices and performances where there is increased likelihood for
25              transmission from contaminated exhaled droplets.   Consider
              practicing these activities through alternative methods (such as
26

27   [8] The court takes judicial notice of this government website *available at*
     https://covid19.ca.gov/stay-home-except-for-essential-needs/.
28

1
2

> internet streaming) that ensure individual congregation members
> perform these activities separately in their own homes.

3    July 6 Guidance at 14; July 29 Worship Guidance at 14.  On February 22, 2021, the State updated

4    places-of-worship guidance on its website.[9]  Feb. 22, 2021 Guidance.  With this most recent

5    update, the State now provides for a "limit of 10 vocal performers who must wear face coverings

6    and maintain distance of at least 12 feet from other performers and 24 feet from congregants" in

7    places of worship.  *Id.*; Suppl. Authority (Feb. 24, 2021), ECF No. 74.  To the extent plaintiffs

8    seek to restrain broader limits on singing and chanting during worship services, the most recent

9    update does not resolve their concerns.

10              **2.  Political Protests**

11              Plaintiffs allege on information and belief that the political protests occurring in California

12    in the Summer of 2020 were not subject to the same restrictions as churches.  FAC ¶ 29; *see also*

13    Mot. at 8.  The State disagrees, and represents that restrictions on indoor singing applied to

14    political protests, restaurants, wineries, bars and churches, all by early July 2020.  Opp'n at 33;

15    Watt Decl. ¶¶ 82–86.

16              On July 1, CDPH published information regarding indoor and, separately, outdoor

17    protests.  Cal. Dep't of Pub. Health, *Stay Home: Q&A* (July 1, 2020).[10] The information was not

18    in a formal guidance document but rather in a document providing answers to relevant questions.

19    /////

20    /////

21

22    [9]  As of this writing the linked guidance has yet to be updated.

23    [10] https://covid19.ca.gov/stay-home-except-for-essential-needs/ ("In [certain] counties, state
      public health directives do not prohibit in-person *indoor* protests and rallies as long as . . . (3)
24    singing and chanting activities are discontinued.  Failure to follow these requirements may result
      in an order to disperse or other enforcement action. Masks and face coverings are required in
25    compliance with CDPH directives.).  The court takes judicial notice of the content on this website
      on July 1, 2020 and July 6, 2020.  In order to confirm past versions of government orders, the
26    court utilized an internet archive resource available at: http://web.archive.org/ by searching the
27    URL, https://covid19.ca.gov/stay-home-except-for-essential-needs, and selecting July 2, 2020 and
      July 7, 2020 (which demonstrates updates on the prior day).
28

1

2  **a.  Indoor Protests**

As directed to indoor protests, the information CDPH provided on July 1, 2020, advised

3  that "activities like chanting, shouting, singing, and group recitation negate the risk-reduction

4  achieved through 6 feet of physical distancing," and directed that those engaged in these activities

5  "should wear face coverings at all times."  Stay Home Q&A (August 31, 2020) at 61, Ex. 28,

6  ECF No. 39-2.  By July 6, 2020, the information was updated to provide that indoor protests were

7  not prohibited as long as, among other things, "singing and chanting activities are discontinued."

8  Watt Decl. ¶ 87.  For a period of time beginning August 5, 2020, indoor protests in certain

9  counties on the State's monitoring list were prohibited entirely.  Stay Home Q&A (August 5,

10  2020) at 5, Ex. 5, FAC, ECF No. 39-2.  Currently, the State prohibits indoor protests in counties

11  in the Blueprint's Tier 1, but permits them in other counties subject to the restrictions articulated

12  in the July 6, 2020 Q&A, including the prohibition on "singing and chanting activities." Cal.

13  Dep't of Pub. Health, *Stay Home: Q&A* (last updated March 9, 2021).[11]  Opp'n at 16.

14  **b.  Outdoor Protests**

Plaintiffs perceive the State's failure to ban singing and chanting at outdoor protests as

15

16  evidence of "clear bias and [an illustration of] the content-based nature of the regulations."  Mot.

17  at 21.  Plaintiffs point to Governor Newsom's offering support to outdoor protests in May and

18  June 2020 as exhibiting a "lack of neutrality towards religion."  Mot. at 18.  The State posits

19  singing at outdoor protests poses a "much smaller risk of spreading COVID-19."  Opp'n at 18;

20  *see also* Rutherford Decl. ¶ 81 ("in general outdoor protests would involve a lower risk of

21  COVID 19 [sic] transmission than indoor worship services . . . [additionally] there is a great

22  distinction between the transmission risk levels associated with group events that take place

23  indoors and those that take place outdoors.").  And the State says, just as the State permits

24  chanting and singing at outdoor worship services, it allows for the same accommodation for

25  outdoor protests. *Id.*

26

27  [11] The court takes judicial notice of this government website *available at*
https://covid19.ca.gov/stay-home-except-for-essential-needs/.

28

1    In the beginning of July 2020, the State clarified there were no singing and chanting

2    restrictions at outdoor worship services or outdoor protests. Watt Decl. ¶ 87.  On the Q&A

3    section of the State's COVID-19 website, it stated outdoor protests were permitted as long as

4    protestors maintained six feet of distance from one another; if six feet of distance was impossible,

5    protestors must wear a mask.[12]  *See also* Stay Home Q&A (August 5, 2020) at 4, Ex. 5, FAC,

6    ECF No. 39-2.  As of this writing, the information in the Q&A section for outdoor protests

7    remains the same as it did on July 1, 2020, and August 5, 2020.[13]  *See also id.*

8                              **c.   Schools and Daycare Centers**

9    Plaintiffs argue at the time the State announced the restriction on indoor singing in places

10   of worship, singing was not prohibited in schools.  Mot. at 9.  They also argue the risk of

11   spreading COVID-19 through singing at places of worship is no greater than, and potentially less

12   than, the risk spread by "children in daycare centers" singing.  *Id.* at 22.  The State disagrees.

13   Opp'n at 10.  First, the State argues that singing indoors is not permitted within schools or

14   daycare centers.  *Id.* at 16.  Second, the State contends daycare centers are unique because

15   children are less susceptible to COVID-19.  Opp'n at 17 (citing to Rutherford Decl. ¶ 23, ECF

16   No. 40).

17   On August 3, 2020, the State published its K-12 Schools Industry Guidance.  August 2020

18   K-12 Schools Guidance, Ex. 13 at 208, ECF No. 35.  The guidance cautioned that "[a]ctivities

19   that involve singing must only take place outdoors."  *Id.*  On January 14, 2021, the guidance was

20   updated with more detailed language as follows:

21               Outdoor singing and band practice are permitted, provided that
22               precautions such as physical distancing and mask wearing are
             implemented to the maximum extent possible. . . . School officials,
             staff, parents, and students should be aware of the increased
23               likelihood for transmission from exhaled aerosols during singing and

24   /////

25

26   _____

     [12] *See supra* note 11.

27
     [13] *Id.*
28

                                         10

1
2
band practice, and physical distancing beyond 6 feet is strongly
recommended for any of these activities.

3   K-12 Schools Industry Guidance (Jan. 14, 2021) (January 2021 K-12 Schools Guidance).[14]  The

4   January 2021 guidance also "strongly discouraged" playing wind instruments.  *Id.*

5                              **d.  Restaurants, Bars, Wineries**

6          Plaintiffs also argue that at the time the State prohibited singing at indoor places of

7   worship, restaurants, bars and wineries were not similarly prevented from allowing indoor

8   singing.  Mot. at 9.  The State disagrees here as well. Opp'n at 10.

9          On July 29, 2020, CDPH issued Restaurant Industry Guidance directing that restaurants

10  "[d]iscontinue activities that encourage movement and shared items between guests including

11  karaoke singing, [and] open mic performances," and that they also "close dance floors and

12  discontinue performances such as musical or dance acts that encourage large gatherings."  July 29

13  Restaurant Industry Guidance, Ex. 11 at 174, Deputy Attorney General Jonathan M. Eisenberg

14  Declaration, ECF No. 35 (Eisenberg Decl.).  On November 24, 2020, new Restaurant Industry

15  Guidance provided that outdoor operations are permitted, with performers maintaining "physical

16  distancing from spectators and other performers.  Nov. 24, 2020 Restaurant Industry Guidance

17  at 3.[15]  Specifically, "Performers who are singing, shouting, playing a wind instrument, or

18  engaging in similar activities without a face covering must maintain at least twelve feet of

19  distance from spectators."  *Id.*

20
21
---

22  [14] The court takes judicial notice of the Jan. 14, 2020 K-12 Schools Guidance *available at*
    https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-
23  19/Consolidated_Schools_Guidance.pdf ) ("Outdoor singing and band practice are permitted,
    provided that precautions such as physical distancing and mask wearing are implemented to the
24  maximum extent possible. Playing of wind instruments . . . is strongly discouraged.  School
    officials, staff, parents, and students should be aware of the increased likelihood for transmission
25  from exhaled aerosols during singing and band practice, and physical distancing beyond 6 feet is
    strongly recommended for any of these activities.").
26

27  [15] The court takes judicial notice of the Nov. 24, 2020 Restaurant Industry Guidance *available at*
    https://files.covid19.ca.gov/pdf/guidance-dine-in-restaurants.pdf.
28

### 3.   Other Gatherings

In October 2020, the CDPH also began restricting singing at all gatherings, defined as events attended by individuals from different households.  Cal. Dep't of Pub. Health, *Guidance for Private Gatherings* (Oct. 9, 2020) (October 2020 Gathering Guidance).[16]  The gathering restrictions were updated in November 2020. Cal. Dep't of Pub. Health, *Guidance for Private Gatherings* (Nov. 13, 2020) (November 2020 Gathering Guidance).[17]  This guidance prohibits indoor singing completely, and "strongly discourage[s]" "singing, chanting, and shouting," even outdoors.  *Id.*  If private gatherings do involve singing, chanting and shouting, participants "should wear a face covering at all times," "maintain at least 6-foot physical distancing" and sing quietly.  *Id.*  The gathering guidance states "it applies to private gatherings, and all other gatherings not covered by existing sector guidance are prohibited."  *Id.*  With its most recent supplemental filing, the State clarifies that places of worship are exempt from the restrictions on other indoor gatherings.  Suppl. Authority (Feb. 24, 2021), ECF No. 74.

### 4.   Music, Television and Film Production

Plaintiffs also argue the restrictions on indoor singing within places of worship do not square with the lack of restrictions on singing in film and television productions.  Mot. at 17, 22; Reply at 17.  Plaintiffs argue the discrepancy between the two sectors is discriminatory.  Mot. at 17.  While pointing to restrictions that are in effect, the State contends generally that the type of singing occurring within the music, television, and film industry does not carry the same level of risk.  Opp'n at 18.  And performers receive extensive protections "such as frequent testing, increased ventilation, and enhanced distancing requirements."  *Id.* (citing Declaration of Exec. Director California Film Commission Colleen Bell ¶ 7, ECF No. 38 (Bell Decl.); Declaration of Chief Operating Officer and General Counsel of the Screen Actors Guild Duncan Crabtree-

---

[16] The court takes judicial notice of this document *available at* https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/CDPH-Guidance-for-the-Prevention-of-COVID-19-Transmission-for-Gatherings-10-09.aspx.

[17] The court takes judicial notice of the October Gathering Guidance *available at* https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/Guidance-for-the-Prevention-of-COVID-19-Transmission-for-Gatherings-November-2020.aspx.

1    Ireland ¶¶ 4-7, ECF No. 34 (Crabtree Decl.)).  The State's expert, Dr. Watt, explains that

2    "communal singing" is less frequent in the entertainment industry; if it is required, he opines it is safe

3    due to the testing procedures in place:  "the risk of transmission due to singing from acting is

4    overall lower than the risk of transmission at a worship gathering."  Watt Decl. ¶ 107.

5            The State has looked to the production studios and unions to craft safety protocols for

6    film, music, and television production during the pandemic.  *See* February 22, 2021 Music, Film,

7    and TV Production Industry Guidance (Feb. 22, 2021 Music, Film, & TV Guidance).[18]  From

8    mid-March to mid-June 2020, there was "virtually no filming" in California due to the pandemic.

9    Bell Decl. ¶ 5.  On June 1, 2020 an Industry-Wide Labor-Management Safety Committee Task

10   Force issued proposed guidelines for resuming production.  White Paper, Ex. 1 at 6, *Id.*  A Film

11   Commission website explains these guidelines were "what government (the state, counties, cities)

12   needed to allow film production to re-open." Cal. Film Commission, *Entertainment Industry*

13   *Resources During COVID-19* (revised September 26, 2020).[19]  Twelve days later, several unions

14   recommended additional protections and protocols.  Bell Decl. ¶ 6.  On September 21, 2020, the

15   studios and unions reached a joint agreement, the "COVID-19 Return to Work Agreement,"

16   which now governs the industry and is set to last until April 30, 2021.[20]  *See also* Return to Work

17   Agreement, Ex. 1 at 66.

18           As required by the Covid-19 Return to Work Agreement, recording artists and performers

19   working in proximity to anyone else must take a COVID-19 diagnostic test.  *See* Crabtree Decl.

20   ¶ 4; *see also* Return to Work Agreement, Ex. 1 at 68–69.  Additionally, individuals at a recording

21

22   [18] https://covid19.ca.gov/industry-guidance/ ("Music, film, and TV production – updated
     February 22, 2021" dropdown) ("To reduce the risk of COVID-19 transmission, productions,
23   cast, crew and other industry workers must abide by safety protocols agreed by labor and
     management, which may be further enhanced by county public health officers.).  The court takes
24   judicial notice of the Feb. 22, 2021 Music, Film & TV guidance.  Some of the updates are also
     memorialized in the most recent State notice of supplemental authority, ECF No. 74.
25

26   [19] The court takes judicial notice of this government website document *available at*
     https://cdn.film.ca.gov/wp-content/uploads/2021/01/Covid-Related-Resources.pdf.
27
     [20] *Id.* at 3.
28

                                                   13

1    session must be temperature screened, "singers must perform alone in isolation" as much as

2    possible, and singing in large groups is permitted only with heavy restrictions.  Crabtree Decl.

3    ¶ 5.  The restrictions include sitting eight feet apart, and fifteen feet if singers have not been tested

4    for COVID-19 daily; not facing toward another's front or back; and arranging singers in a way

5    that directs their breathing away from one another.  *Id.* ¶ 6.  Additionally, studios and other

6    recording spaces must conform to detailed ventilation requirements.  *Id.* ¶ 7.  Film Commission

7    Director Bell avers, as of October 14, 2020, she was unaware of "any current film or television

8    productions involving large groups of people singing."  Bell Decl. ¶ 3.  Most recently, on

9    February 22, 2021, the State updated its guidance for music, film, and television production, and

10   banned live audiences entirely, apparently until further notice.  Feb. 22, 2021 Music, Film, & TV

11   Guidance ("Live audiences are not allowed"); *see also* Suppl. Authority (Feb. 24, 2021) at 2.

12           **D.  Evidence Regarding Risks of Singing During Pandemic**

13                **1.  Evidence Relied on by State Defendants**

14           In determining which activities can open at which tier of the Blueprint, the State has

15   assessed activities based on their risk of spreading COVID-19.[21]  The State relies on the same

16   evidence for all the restrictions reviewed above, with some attention paid to sector-specific data.

17   It understands singing is an activity "known to cause increased [COVID-19] spread."  Feb. 22,

18   2021 Guidance.

19           In particular, the State relies on evidence presented in the declarations of two doctors,

20   James Watt with CDPH and George Rutherford at the University of California, San Francisco.[22]

21   Both doctors summarize the scientific data they say demonstrates how singing causes an

22   increased spread of COVID-19.  Watt Decl. ¶¶ 25–46; Rutherford Decl. ¶¶ 60–71.  Dr. Watt

23   _____

24   [21] *See supra* note 7.

25   [22] Dr. Watt is Chief of the Division of Communicable Disease Control for the Center for
     Infectious Diseases at the California Department of Public Health and was Acting Deputy
26   Director of the Center for Infectious Diseases and Interim State Epidemiologist when the
     restrictions plaintiffs challenge went into effect.  Dr. George Rutherford is Head of the Division
27   of Infectious Disease and Global Epidemiology and Co-Chair of the Chancellor's Global Disaster
     Assistance Committee at University of California San Francisco.

28

opines, "[m]ost scientists believe that group singing, particularly when engaged in while in close proximity to others in an enclosed space, carries a high risk of spreading the COVID-19 virus through the emission of infected droplets and aerosols." Watt Decl. ¶ 45.  He notes a February 2019 study of aerosol emissions found the "rate of particle emission during normal human speech is positively correlated with the loudness" of vocalization, suggesting the louder one sings, the more particles one expels. *Id.* (referencing Asadi, S., et al., *Aerosol Emission and Superemission During Human Speech Increase with Voice Loudness*, 9 Sci. Rep. 2348 (2019)).[23]  The more particles one expels, the more likely a person spreads a respiratory disease, like COVID-19.  *Id.*  Doctor Rutherford agrees:

> There is consensus among public health officials, and it is my opinion based on my own knowledge and review of the literature, that singing, chanting, shouting and similar vocalization substantially increase the risk of both droplet and aerosol transmission of the novel coronavirus by infectious persons.  This is because these activities cause the release of an [sic] larger number of particles that may carry the virus, and are believed to increase the distance that droplets or aerosolized particles containing the virus can travel compared to people who are speaking at a normal volume.  In addition, the more particles that are released from an infected person and reach another person, the higher the likelihood the other person will receive a viral load sufficient to overcome his or her body's defenses and cause a SARS-CoV-2 infection.

Rutherford Decl. ¶ 55, ECF No. 40.  He opines that wearing a mask may obviate the risk from singing, but does not eliminate it.  *Id.* ¶ 61.

In support of its restrictions on indoor singing, the State points to three events as exemplars of what it seeks to prevent.  First, a two-and-a-half-hour choir practice in March 2020 at a church in Washington State led to 52 of the 61 attendees contracting the COVID-19 virus, with at least two dying.  Watt Decl. ¶ 46(i); *see also* Richard Read, L.A. Times, *A Choir Decided to Go Ahead With Rehearsal. Now Dozens Of Members Have COVID-19 and Two Are Dead* (Mar. 29, 2020, 7:34 PM).[24]  Second, an indoor church service in Arkansas, also in March 2020,

---

[23] https://doi.org/10.1038/s41598-019-38808-z.

[24] https://www.latimes.com/world-nation/story/2020-03-29/coronavirus-choir-outbreak.

1   contributed to 35 of 92 attendees becoming infected with COVID-19.  Watt Decl. ¶ 46(ii); *see*

2   *also* Erika Edwards, NBC News, *COVID-19 Spread Silently Through a Rural Arkansas Church*

3   *in March*, *CDC says* (May 19, 2020, 11:58 AM).[25]  Third, a large church service in South Korea

4   on or about February 16, 2020, led to more than 2,000 COVID-19 infections from congregants in

5   close proximity to each other "wailing 'amen,'" among other practices.  Watt Decl. ¶ 46(iii)

6   (citing Dasl Yoon & Timothy Martin, Wall St. J., *Why South Korean Church Was the Perfect*

7   *Petri Dish for Coronavirus*  (Mar. 2, 2020, 8:09 AM)).[26]

8          At hearing and in their reply, plaintiffs argued the State's evidence is lacking because

9   many of the studies of choral singing on which the State relies investigated indoor singing by

10   choirs without social distancing or mask-wearing guidelines.  *See* Reply at 14, ECF No. 45.

11   Plaintiffs also argue that the "super-spreader" choir events occurred when the public had minimal

12   knowledge of COVID-19 and thus did not understand the importance of using safety protocols.

13   *Id.*

14          **2.   Plaintiffs' Evidence**

15          Dr. Jay-Anta Bhattacharya, with Stanford University,[27] has provided a declaration in

16   support of plaintiffs.  Dr. Bhattacharya does not contest the validity of defendants' scientific

17   evidence.  Bhattacharya Decl. ¶ 14, ECF No. 47.  Instead, Dr. Bhattacharya opines that the

18   conclusions of Dr. Watt and Dr. Rutherford are overbroad.  Rather, he believes, a church should

19   be able to safely host singing and chanting indoors.  *Id.*  Specifically, Dr. Bhattacharya avers that

20   "singing during indoor religious worship services . . . is consistent with good public health

---

21
22   [25] https://www.nbcnews.com/health/health-news/covid-19-spread-silently-through-rural-arkansas-church-march-cdc-n1210391.

23
24   [26] https://www.wsj.com/articles/why-a-south-korean-church-was-the-perfect-petri-dish-for-coronavirus-11583082110.

25   [27] Dr. Jayanta Bhattacharya, M.D., Ph.D., is a Professor of Medicine at Stanford University and
26   has worked on the Stanford University faculty since 2001.  Currently he serves as the director of
     the Stanford Center for Demography and Economics of Health and Aging.  He is a co-author of
27   the Great Barrington Declaration, issued in October 2020, expressing concern about prevailing
     COVID-19 policies and recommending an alternative approach known as "Focused Protection."
28   https://gbdeclaration.org/.

practice if the CDC guidelines" are followed.  *Id.* ¶¶ 17, 32 (identifying nine CDC guidelines including washing hands, practicing six-feet of social distancing, and sanitizing surfaces).  In support of this conclusion, Dr. Bhattacharya points to the mental health benefits of participation in faith-based services and activities.  *Id.* ¶¶ 25–27.  He does not cite any scientific study demonstrating that masking and distancing is sufficient to slow the spread of COVID-19 during indoor singing.

In their reply, plaintiffs also point to one study cited by the State that they argue demonstrates face masks eliminate the need for a restriction on indoor singing.  *See* Reply at 10 (citing to Alsved, M., et al., *Exhaled Respiratory Particles During Singing and Talking,* Aerosol Sci. & Tech. (Sept. 17, 2020) (Alsved Study)).  However, while the study showed that face masks reduce aerosol emission, face masks do not reduce it entirely.  *See* Watt Decl. ¶ 54; *see also* Alsved Study ("singing in groups is likely to be an activity at risk of transmitting infection if no appropriate control and prevention measures are applied, such as distancing, hygiene, ventilation and shielding.").

## II.   LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy, never awarded as of right."  *Winter*, 555 U.S. at 24.  In determining whether to issue a preliminary injunction, courts must consider (1) whether the moving party "is likely to succeed on the merits" (2) whether it is "likely to suffer irreparable harm in the absence of preliminary relief," (3) whether "the balance of equities tips in [its] favor, and" (4) whether "an injunction is in the public interest."  *Id.* at 20.  The moving party has the burden of showing an injunction is warranted by clear and convincing evidence.  *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) ("And what is at issue here is . . . plaintiff's motion for preliminary injunctive relief, as to which the requirement for substantial proof is much higher."); *see also Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 442 (1974).

The Ninth Circuit sometimes employs an alternate formulation of the *Winter* test, referred to as the "serious questions" test.  *Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012).  "A preliminary injunction is appropriate when a plaintiff demonstrates . . . that serious questions going to the merits were raised and the balance of hardships tips strongly in plaintiff's favor."

1    *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011) (quoting *Lands*

2    *Council v. McNair*, 537 F.3d 981, 986–87 (9th Cir. 2008)) (internal quotations omitted).  Under

3    the "serious questions" approach to a preliminary injunction, the court may use a "sliding scale"

4    where "[t]he elements of the preliminary injunction test must be balanced, so that a stronger

5    showing of one element may offset a weaker showing of another."  *Lopez v. Brewer*, 680 F.3d

6    1068, 1072 (9th Cir. 2012).  *Winter* was decided after the initial articulation of the "serious

7    questions" test but does not overrule it.  *Cottrell*, 632 F.3d at 1135.  The "serious questions" test

8    must be applied in conjunction with review of the other two *Winter* factors, likelihood of

9    irreparable injury and whether the injunction is in the public interest.  *Id.*

10   **III.   DISCUSSION**

11          Plaintiffs argue the State's prohibition on indoor singing violates their First Amendment

12   rights to Free Exercise and Speech, their Fourteenth Amendment right to Equal Protection, and

13   the Establishment Clause.  As explained below, the court finds plaintiffs have not met their

14   burden of showing they are likely to succeed on the merits of any claim, or raised serious

15   questions going to the merits, and so the court does not reach the other prongs of the preliminary

16   injunction test.

17          **A.  First Amendment – Free Exercise**

18          Plaintiffs first contend the State's restriction on indoor singing in places of worship

19   violates their right to free exercise of religion.  FAC 12–14; Mot. at 15–17.  The Free Exercise

20   Clause of the First Amendment, applied to the states by the Fourteenth Amendment, *Cantwell v.*

21   *Connecticut*, 310 U.S. 296, 303 (1940), provides, "Congress shall make no law respecting an

22   establishment of religion, or prohibiting the free exercise thereof," U.S. Const. Amend. I.  The

23   right to freely exercise one's religion "does not relieve an individual of the obligation to comply

24   with a 'valid and neutral law of general applicability on the ground that the law proscribes (or

25   prescribes) conduct that his religion prescribes (or proscribes).'"  *Emp't Div. Dept. of Human*

26   *Resources of Oregon v. Smith*, 494 U.S. 872, 879 (1990) (quoting *United States v. Lee*, 455 U.S.

27

28

18

1    252, 263 n.3 (1982) (Stevens, J., *concurring*)).[28]  A law that is "neutral and of general

2    applicability," as the State argues its restriction is here, "need not be justified by a compelling

3    governmental interest even if the law has the incidental effect of burdening a particular religious

4    practice." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993).

5    "Such laws need only survive rational basis review." *Miller v. Reed*, 176 F.3d 1202, 1206 (9th

6    Cir. 1999).  "The tests for 'neutrality and general applicability are interrelated, and . . . failure to

7    satisfy one requirement is a likely indication that the other has not been satisfied,'" yet formally,

8    the two are analyzed separately "so as to evaluate the text of the challenged law as well as the

9    'effect . . . in its real operation.'" *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1076 (9th Cir.

10   2015) (alterations in original) (quoting *Church of the Lukumi Babalu Aye*, 508 U.S. at 535).

11          In assessing whether a law satisfies the first prong of the *Smith* test, neutrality, the court

12   considers both facial neutrality and operational neutrality.  *Stormans*, 794 F.3d at 1076.  "A law

13   lacks facial neutrality if it refers to a religious practice without a secular meaning discernable

14   from the language or context." *Church of the Lukumi Babalu Aye*, 508 U.S. at 533.  Operational

15   neutrality, by contrast, requires the court to examine "the historical background of the decision

16   under challenge, the specific series of events leading to the enactment or official policy in

17   question, and the legislative or administrative history." *Masterpiece Cakeshop, Ltd. v. Colo. Civil

18   Rights Com'n*, 138 S. Ct. 1719, 1722 (2018) (quoting *Church of the Lukumi Babalu Aye*, 508 U.S.

19   at 540); *see also Stormans*, 794 F.3d at 1076–77 (noting neutrality prohibits "religious

20   gerrymander[s], [] impermissible attempt[s] to target religious practices through careful

21   legislative drafting.").

22          The second part of the *Smith* test, general applicability, looks to whether the law

23   "impose[s] burdens only on conduct motivated by religious belief" in a "selective manner," and

24   considers whether the asserted government interest is pretextual.  *Church of the Lukumi Babalu

25   _____

26   [28]  While *Smith* was superseded by the Religious Freedom Restoration Act in 1993, the Court
     later held that Congress exceeded its constitutional authority in applying RFRA to the states.  *See
27   City of Boerne v. Flores*, 521 U.S. 507 (1997).  *Smith* remains good law and has been applied to
     state laws by the Court as recently as December 17, 2020 in *Danville Christian Academy, Inc. v.
28   Beshear*, 141 S. Ct. 527 (2020).

1    *Aye,* 508 U.S. at 543 (statute at issue was underinclusive to serve asserted interest and so not

2    generally applicable).

3         In its two recent opinions, the Ninth Circuit upheld the State's ban on indoor singing and

4    chanting, which is the same restriction challenged here. *South Bay*, 985 F.3d at 1152; *Harvest*

5    *Rock*, 985 F.3d at 771.  The Circuit found that because the ban applied across all indoor activities,

6    the ban was neutral and generally applicable and thus was subject to rational basis review. *See*

7    *South Bay*, 985 F.3d at 1132, 1152.  It held the ban survived rational basis review as it was

8    rationally related to controlling the spread of COVID-19. *Id.*  In *South Bay*, in an unsigned order

9    granting an injunction in part, the Supreme Court affirmed the Ninth Circuit's decision in *South*

10   *Bay* with respect to the indoor singing ban specifically, by a vote of five to three.[29]  *See* 141 S. Ct.

11   at 716 ("The application is denied with respect to the prohibition on singing and chanting during

12   indoor services.").

13        Given the Ninth Circuit's decisions in *South Bay* and *Harvest Rock*, and the Supreme

14   Court's decision with respect to indoor singing and chanting in *South Bay*, plaintiffs cannot

15   succeed on their free exercise claim here.  The record before this court is consistent with these

16   controlling decisions.  Beginning in the same time frame, in Summer 2020, the State imposed a

17   ban on indoor singing and chanting across a range of activities, with some tailoring depending on

18   the precise nature of the activity.  Restrictions on worship services first took effect on July 1,

19   2020.  July 1, 2020 Guidance.  Equivalent, tailored restrictions on indoor protests took effect on

20   July 6, 2020, Watt Decl. ¶¶ 86–87, and on schools on August 3, 2020.  August 2020 K-12

21   Schools Guidance at 26 (permitting outdoor singing and band practice only).  Some restrictions

22   on indoor activities took effect on restaurants initially on July 29, 2020, Ex. 11 at 174, Eisenberg

23   Decl., with further restrictions preventing any indoor operations imposed on November 24, 2020.

24   Nov. 24 Restaurant Industry Guidance at 3 (prohibiting any indoor performances in Tier 1, and

25

26   [29] Justice Gorsuch and Justice Thomas would have granted the injunction on indoor singing
     without condition while Justice Alito would have granted the injunction, but stayed the injunction
27   for 30 days only lifting it if the State could demonstrate that there was no other means available to
     reduce the spread of COVID-19. *See* 141 S. Ct. 716 (2021)
28

1   restricting even outdoor performances).  After it became clear that outdoor private gatherings

2   were a source of outbreaks, the State imposed restrictions on them in October 2020, and by

3   November 13, 2020 clarified that singing and chanting was prohibited at indoor gatherings.  *See*

4   October 2020 Gathering Guidance; November 2020 Gathering Guidance.  Even as the State has

5   modified restrictions in a number of these categories, it has not loosened the restrictions on indoor

6   singing for categories other than churches.

7          While music, film and television production has been allowed to engage in some indoor

8   singing since June 2020, this activity has been subject to stringent requirements negotiated

9   between studios and unions, and effectively blessed by the State.  *See* Bell Decl. ¶¶ 6–7; Crabtree

10   Decl. ¶¶ 3–7.  The State's allowing of this indoor activity is consistent with its evaluation of the

11   public health data regarding the risks of singing in the studio environment, and effective

12   management of those risks.  Watt Decl. ¶ 107.  Most recently, the State has tightened restrictions

13   on this industry by enacting a prohibition on live audiences.  Feb. 22, 2021 Music, Film, & TV

14   Guidance.

15          At the same time, the State has now issued protocols allowing those who serve as

16   performers during church services, presumably including choir members or soloists, to sing

17   indoors subject to masking and distancing.  Under these newest rules, the State argues, "worship

18   services are treated more favorably than the entertainment industry."  Suppl. Authority (Feb. 24,

19   2021) at 2.  To the extent one might question whether churches were being treated equivalently to

20   the entertainment industry, that doubt appears to have been eliminated beyond a shadow of a

21   doubt.  *Cf. South Bay*, 141 S. Ct. at 716 ("it remains unclear whether the singing ban applies

22   across the board (and thus constitutes a neutral and generally applicable law) or else favors

23   certain sectors (and thus triggers more searching review). . . . if a chorister can sing in a

24   Hollywood studio but not in her church, California's regulations cannot be viewed as neutral.")

25   (Barrett, J., concurring).

26          Plaintiffs have not established that their free exercise claims are likely to succeed.

27   /////

28   /////

**B.  Free Speech**

Plaintiffs also challenge the State's regulations as violating their free speech rights.  FAC at 15–16; Mot. 19–21.  "The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits laws that abridge the freedom of speech."  *Nat'l Inst. of Family & Life Advocates* (*NIFLA*) *v. Becerra*, 138 S. Ct. 2361, 2371 (2018).  Laws that target speech "based on its communicative content" are unconstitutional unless the government shows they are "narrowly tailored to serve compelling state interests."  *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015).  In order to determine whether a law is content-based, a court considers "whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys."  *Recycle for Change v. City of Oakland*, 856 F.3d 666, 670 (9th Cir. 2017) (citing *Reed v. Town of Gilbert*, 576 U.S. 155, 135 S.Ct. 2218, 2227 (2015)).

Plaintiffs assert the restriction on indoor singing by churches is a content-based restriction and thus compels strict scrutiny, Mot. at 19, but they do not demonstrate how the restriction is connected to the "message a speaker conveys."  They do not point to anything showing the indoor singing ban applies based on the content of a worship service, rather than its location.  Rather, the ban, at least until modified modestly recently, applied to all indoor singing in any kind of church service, regardless of denomination.  The recent modifications do not change the analysis. Plaintiffs have not shown they are likely to succeed with a theory of content-based restrictions.

A content-neutral regulation must still withstand Constitutional scrutiny, and the COVID-19 guidelines here do. "A permissible time, place, or manner restriction must also: (1) be narrowly tailored to serve a significant governmental interest; and (2) leave open ample alternative channels for communication of the information."  *Givens v. Newsom*, 459 F. Supp. 3d 1302, 1312–13 (E.D. Cal.), *appeal dismissed*, 830 F. App'x 560 (9th Cir. 2020).  Here, even prior to the February 22, 2021 update, the guidelines were narrowly tailored to serve the government's significant interest in stopping the spread of COVID-19.  Given the reliable evidence on which the State relied showing that singing creates a high risk of COVID-19 transmission, restricting indoor congregational singing serves the government's interest in preventing or slowing the spread of the disease.  *See* Watt Decl. ¶ 45.  The document COVID-19 outbreaks after choir

1    practices and church services lends support to the State's decision to restrict indoor singing.  *Id.* ¶

2    46.  Moreover, the State left open "ample alternative channels," including gathering online or

3    outside and socially distant.

4          The State's most recent revision further expands the channels available for expression,

5    even in the "Widespread" Tier, where a number of vocal performers may sing for a congregation,

6    wearing masks and distancing.  Suppl. Authority (Feb. 24, 2021) at 1.  Lower tiers impose no cap

7    on the number of vocal performers, who must still wear face coverings and maintain social

8    distance.  *Id.* at 1–2.

9          Plaintiffs are not likely to succeed on their free speech claim.

10         **C.  Equal Protection**

11         The Equal Protection Clause provides: "no State shall deny to any person within its

12   jurisdiction the equal protection of the laws."  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S.

13   432, 439 (1985).  In essence, it requires "all persons similarly situated should be treated alike."

14   *Id.* at 439.  To establish an Equal Protection claim, plaintiffs must first identify a group or class

15   that is treated differently from a similarly situated group.  *Rosenbaum v. City & Cty. of San*

16   *Francisco*, 484 F.3d 1142, 1153 (9th Cir. 2007).  Unless the different treatment affects a "suspect

17   class," a "quasi-suspect class," or impinges on a fundamental freedom, the State's restrictions are

18   subject to rational basis review.  *See Karnoski v. Trump*, 926 F.3d 1180, 1999–1201 (9th Cir.

19   2019); *see also O'Connor v. State of Nev.*, 27 F.3d 357, 360 (9th Cir. 1994).  Suspect or quasi-

20   suspect classes have four characteristics: (1) a history of discrimination; (2) a defining

21   characteristic that often bears a relationship to its ability to perform or contribute to society; (3) a

22   defining trait that is immutable or distinguishable and establishes it as a discrete group; and (4)

23   political powerlessness or minority status.  *Karnoski*, 926 F.3d at 1192.

24         Plaintiffs contend the indoor singing ban applies more restrictively to religious singing

25   and chanting than other types of singing and chanting and therefore warrants strict scrutiny.  FAC

26   at 16–17; Mot. at 21–22 (citing *Police Department of Chicago v. Mosley*, 408 U.S. 92 (1972)).

27   But as reviewed above, the State's restrictions do not burden religion disproportionately; indoor

28   religious singing and chanting is subject to equivalent restrictions when compared to secular

1    activities including indoor protests, school activities and restaurants.  *See* State Opp'n at 8.  The

2    restrictions are thus evaluated under rational basis review and are likely to pass muster for the

3    reasons discussed above.  *See Prince v. Massachusetts*, 321 U.S. 158, 170 (1944) (denying equal

4    protection claim that was "but another phrasing" of a religious freedom claim).

5           Plaintiffs appear to argue the State's refusal to implement a singing ban on outdoor

6    protestors, "children in daycare centers," and other performers demonstrates the restriction on

7    churches is not narrowly tailored.  Mot. at 22.  As noted above, however, within several days in

8    July 2020, the rules applicable to outdoor protests and churches were made equivalent.  *See* Watt

9    Decl. ¶ 87.  Regarding other indoor secular activities, the State has shown any difference in the

10   level of restriction is rationally related to a different level of risk.  For example, singing is not

11   banned in "shopping malls, offices . . . and [some] other workplaces" when those places "pose a

12   lower risk of transmission than in large gatherings that have the purpose of engaging in a shared

13   communal experience."  *Id.* ¶ 105.  While plaintiffs argue that singing is not banned in child care

14   centers, indoor singing is banned at K-12 schools.  *Id.* ¶ 105; *see also* August, 2020 K-12 Schools

15   Guidance.  Ex. 13 at 208, ECF No. 35.  The State notes children are "significantly less susceptible

16   to COVID-19 than adults," and offers a reasoned explanation for the distinctions it makes,

17   contrasting religious congregations, which sing repeatedly and for extended periods of time, with

18   students in schools who sing sporadically and in limited scenarios, thus mitigating the potential

19   for spread of COVID-19.  Opp'n  at 17; *see also* Watt Decl. ¶ 106.

20          The State's most recent modifications to the guidance applicable to churches and that

21   governing the entertainment industry only improve circumstances for plaintiffs from an equal

22   protection standpoint.

23          Plaintiffs are unlikely to succeed on the merits of their Equal Protection claim.

24          **D.  Establishment Clause**

25          Plaintiffs finally contend the prohibition on singing violates the Establishment Clause,

26   which upholds an "individual's freedom to believe, to worship, and to express himself in

27   accordance with the dictates of his own conscience."  *Freedom from Religion Found., Inc. v.*

28   *Chino Valley Unified Sch. Dist. Bd. of Educ.*, 896 F.3d 1132, 1137 (9th Cir. 2018).  Plaintiffs rely

                                                    24

1   on *Lemon v. Kurtzman*, 403 U.S. 602, 612–13 (1971),[30] which provides a statute is constitutional

2   if it has (1) a secular purpose; (2) a principal or primary effect that neither advances nor inhibits

3   religion; and (3) does not foster excessive entanglement with religion.  *Id.*

4        Plaintiffs repeat the argument supporting their Free Exercise Claim, that the State's

5   restrictions impermissibly discriminate between secular and religious activities.  They claim this

6   discrimination represents "a value judgment that political and social expression in the form of

7   protests is substantially more important than religious expression in the form of worship."  Mot.

8   at 23–24.  For the same reasons discussed above, the court finds California's prohibitions on

9   singing and chanting do not discriminate between religious and secular activities, including

10   political protests.

11        Plaintiffs also argue the enforcement of California's prohibitions impermissibly entangles

12   the State with religion.  Mot. at 24 (citing *Lemon*, 403 U.S. at 620–21).  But the "entanglement

13   must be excessive before it runs afoul of the Establishment Clause."  *Agostini v. Felton*, 521 U.S.

14   203, 234 (1997) (internal quotation omitted).  In *Lemon*, for example, the entanglement was

15   excessive because the regulation required inspection of a religious school's financial records;

16   government auditors subjectively determined whether expenditures were religious.  403 U.S. at

17   620–22.  Plaintiffs identify no similar entanglement here.  They do not argue, for example, that

18   law enforcement officers are present at their services or otherwise engaged in close monitoring of

19   their religious activities.  They also do not argue the government is in any way imposing its

20   subjective determinations on the content of their service; they do not say they are prevented from

21   singing certain hymns because they may only do so outside, at a distance.  *See* Mot. at 24.

22   Plaintiffs instead argue broadly, without legal support, that any restriction on conduct against

23   their religious organizations is unconstitutional.  *See id.*

24        The Establishment Clause claim also is unlikely to succeed on the merits.

25   */////*

26

27   [30]  Although the Supreme Court at times has signaled the *Lemon* test has fallen out of favor, it has repeatedly declined to overrule that decision.  *See, e.g.*, *Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2080 (2019).

28

IV.     **CONCLUSION**

For the reasons explained above, plaintiffs' request for a preliminary injunction is **denied**.

This order resolves ECF No. 19.

IT IS SO ORDERED

DATED: March 10, 2021.

_____
CHIEF UNITED STATES DISTRICT JUDGE